## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**PEARLEASE LOWERY,**

     **Plaintiff,**

**vs.**                            **Case No.  4:08cv323-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the

decision of the Commissioner be reversed and Plaintiff's applications for benefits be

granted.

**Procedural status of the case**

Plaintiff, Pearlease Lowery, applied for disability insurance benefits and

supplemental security income benefits.  Plaintiff was 51 years old at the time of the

administrative hearing (held on November 14, 2006), has a 12th grade equivalency

education with some clerical training, and has past relevant work as a telemarketer and a fundraiser.  R. 380-382.  Plaintiff alleges disability due to osteoarthritis, diabetic neuropathy, diabetes, congestive heart failure, sleep apnea, obesity, and depression. She alleges onset of disability on November 28, 2005, her last day of work as a telemarketer.  R. 379-380.

At step 2 of the 5 step procedure, the Administrative Law Judge found that Plaintiff has the following severe impairments: asthma, obstructive sleep apnea, neck, shoulder, and back pain, "sprain/contusion" of the cervical and lumbar spine, status post impingement of the right shoulder, status post osteoarthritis of her knee, status post spondylolisthesis,[1] diabetes, status post arthroscopic subacromial decompression- arthroscopic clavicle excision, and obesity.  R. 20.  He found that none of these impairments met or equaled a Listed impairment.  R. 21.  He further found that Plaintiff has the residual functional capacity to do sedentary work with no climbing, no work at unprotected heights or around dangerous machinery, and avoidance of exposure to fumes and temperature extremes.  R. 21-22.  He determined that Plaintiff can do her past relevant work as a telemarketer and as a fundraiser, both sedentary jobs, and was not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  <u>Chester</u>

---

[1] Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips forward and onto a bone below it.  A sign of this condition is that a straight leg raise may be uncomfortable or painful.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

　　　The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

　　1.　　Is the individual currently engaged in substantial gainful activity?

　　2.　　Does the individual have any severe impairments?

　　3.　　Does the individual have any severe impairments that meet or
　　　　　equal those listed in Appendix 1 of 20 C.F.R. Part 404?

　　4.　　Does the individual have any impairments which prevent past
　　　　　relevant work?

　　5.　　Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**[2]

Plaintiff testified that she is five feet six inches tall, and weighed 311 pounds at

that time.  R. 381-382.  Plaintiff acknowledged that her physicians had encouraged her

to lose weight.  R. 397.  She said she was trying and had lost 20 pounds.  Id.

She said that she is in constant pain.  R. 383.  The pain runs down her back,

down her legs, and in her neck.  Id.  She said that back pain was her primary problem

keeping her from working.  R. 390.  She said that she had previously worked while

experiencing pain, but it's "just too much" now.  Id.  Early in the hearing Plaintiff asked

permission to stand, stating that she could not sit.  R. 383.

Plaintiff said she stopped working in November, 2005, because there was no

comfortable way for her to sit or stand.  Id.  She said that the best position for her was

lying down.  R. 399.  She thought that she could sit for only about an hour.  R. 400.  She

thought that she could stand for 10 minutes.  Id.  Dr. Thompson prescribed a cane for

her to use.  R. 399.  She uses it when walking outside.  R. 404.  She said she could

walk less than 100 yards.  R. 400.  She could not bend and pick up something from the

floor.  R. 401.  Plaintiff said that she was not sure whether she could lift a gallon of milk

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at: http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

with both hands while sitting.  R. 400.  She said that on some days she has great

difficulty getting out of bed.  R. 401-402.

Plaintiff testified that she does not drive, can fix a simple breakfast for herself,

and sometimes does the dishes.  R. 402.  She relies upon her roommate to do laundry

and vacuuming.  *Id.*  She spends a lot of time during the day lying down, not sitting.  *Id.*

She does sit up a couple of hours during the day.  R. 403.  She said that she cannot use

the shower.  R. 404.

Plaintiff said that she had worn a prescription brace for her back for about a year

and a half.  R. 391.  The brace was prescribed by Dr. Murphy.  *Id.*  She also has

problems with her shoulders.  *Id.*  She said she needed back surgery.  *Id.*  Plaintiff said

that her orthopedic physician, Dr. Murphy, had released her from treatment because

she had reached maximum medical improvement (MMI).  R. 392.  She said that when

she had had shoulder surgery, she experienced problems coming out of anesthesia.  R.

393.  She was told that her surgeon could not do back surgery because the physicians

were afraid she would not recover from anesthesia.  *Id.*

Plaintiff said that she took hydrocodone[3] for pain.  R. 394.  This was prescribed

by Dr. Murphy.  *Id.*  She was treated for shoulder pain by Dr. Thompson, but said that

her back pain was worse than the shoulder pain.  R. 394-395.  She needed shoulder

surgery, but Dr. Thompson was hesitant to do it.  R. 395.

---

[3] Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

Plaintiff said that the side effects from her medications include drowsiness, dry mouth, headache, upset stomach, and diarrhea.  R. 396.  She said that "just about every other medication I take the side effect is drowsiness."  *Id.*  Plaintiff used a "C-PAP"[4] at night as a treatment for sleep apnea, but said she did not sleep much at all at night.  R. 398.

**Medical Evidence**

On May 16, 2000, William H. Thompson, M.D., performed surgery upon Plaintiff's left knee.  R. 176.  There was an extensive grade 3 and 4 chondromalacia[5] of the patellofemoral joint with loose cartilaginous edges, grade 4 chondromalacia of the medial femoral condyle, extensive grade 3 and 4 chondromalacia of the entire weightbearing surface of the lateral femoral condyle and tibial plateau, and degenerative lateral meniscus tear in the inner rim encompassing the posterior, mid, and anterior horns.  R. 176-177.  On June 26, 2000, Plaintiff was seen by Dr. Thompson.  R. 173.  She was having a difficult time with therapy and he thought she "may not get total relief from arthroscopy due to her pre-existing arthritis" and might need a knee replacement.  *Id.*  He said: "Given that she is making slow progress, I do not feel like this problem will change significantly in the near future and would

---

[4] People with obstructive sleep apnea, particularly those who have excessive daytime sleepiness, benefit most predictably from continuous positive airway pressure (CPAP).  With CPAP, people breathe through a face or nose mask that provides a slightly higher pressure in the airway.  This increased pressure props the throat open as the person breathes in.  CPAP can be given with or without humidifying the delivered air.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

[5] Chondromalacia is the abnormal softening of cartilage.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

recommend work conditioning, work hardening, and continued therapy . . . ."  *Id.*  On July 28, 2000, Plaintiff was seen by Dr. Thompson.  R. 172.  She complained of pain, including back and right knee pain.  *Id.*  He thought that she had reached maximum medical improvement, with a 16% impairment of the whole person, considering only her impairment to her left knee.  *Id.*  He released her to "permanent restrictions of sedentary to light work."  *Id.*  He wrote a prescription for a cane.  *Id.*  On August 30, 2000, Plaintiff was seen by Dr. Thompson.  R. 171.  She was using a brace, had some recurrent swelling and some difficulties with the brace.  *Id.*  His diagnosis was osteoarthritis.  *Id.*  He said she could return to work with the same restrictions, but "she will definitely need future care," and "in all likelihood, may require a total knee replacement in the future."  *Id.*

On July 30, 2003, Plaintiff was diagnosed as having minimal obstructive airway disease.  R. 114.  On August 1, 2003, Plaintiff arrived at the emergency room on a stretcher in respiratory distress.  R. 115, 117.  On August 30, 2003, she returned to the emergency room with complaints of inability to lie down, difficulty breathing, and sleep deprivation.  R. 129.  She had moderate pulmonary edema, and it was thought likely that she had "obesity hypoventilation syndrome."  R. 127.  She had tried propping herself up to sleep without success.  R. 126.  She was scheduled for a sleep study.  *Id.*  On September 2, 2003, Plaintiff underwent a sleep study and was diagnosed with significant sleep apnea with nocturnal desaturation.  R. 132.  It was recommended that

she lose weight to "ideal body-weight." *Id.*  She had a BMI (body mass index) of 60.[6]  *Id.*

On April 21, 2004, Plaintiff was seen by Gregg A. Alexander for neck, right

shoulder, and low back pain caused at work on April 7, 2004, when Plaintiff fell from her

chair.  R. 162.  She continued to work at that time in a mostly sedentary telemarketing

job for Dial America.  *Id.*  As "medical concerns," Dr. Alexander noted high blood

pressure, congestive heart failure, diabetes, and asthma.  *Id.*  Plaintiff then weighed 312

pounds.  Her standing posture was antalgic, she had hyperlordosis[7] with forward

leaning, and marked pain was noted to light touch throughout the upper back, neck, and

lumbar areas.  *Id.*  Range of motion could not be adequately performed, and it was

thought that Plaintiff's effort was "incomplete" with regard to resistence muscle testing.

*Id.*  No muscle atrophy or fasciculation[8] was noted.  *Id.*  The assessment was

"contusions" or sprain of the lumbar and cervical spine and right shoulder.  *Id.*  MRI

studies were ordered.  *Id.*  Dr. Alexander found that Plaintiff should continue with

sedentary work with a sit or stand option.  *Id.*  As will be noted ahead, Plaintiff continued

to work in the sedentary job for the telemarketing firm.

-----

[6] The Clinical Guidelines recognize three levels of obesity.  Level I includes BMIs of 30.0-34.9.  Level II includes BMIs of 35.0-39.9.  Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40.  These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.  SSR 02-1p.

[7] Lordosis is the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side, also called also hollow back, saddle back, and swayback.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

[8] A fasciculation is the a minor local contraction (twitch) of a muscle.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

The MRI occurred on May 10, 2004.  R. 161.  Moderate degeneration and inflammation involving the AC joint with a significant inferior spur was found in the right shoulder.  *Id.*  Plaintiff's lumbar MRI revealed no spondylosis,[9] significant bulge, or disc herniation, but she had mild disc degeneration at L3-4 and moderate degeneration at L4-5.  R. 160.  The cervical MRI revealed mild degeneration at C5-6 "with small and wide combination disk protrusion and spondylosis that is more prominent to the left extending close to the anterior margin of the cord causing some narrowing of the left foramen, while the right foramen is clear," and a possible "very minor disk bulge at C6-7."  R. 159.

On May 24, 2004, Dr. Alexander noted from the MRI that "overall the anatomy looks very good for [Plaintiff's] age."  R. 158.  Plaintiff that day was having difficulty getting up out of her chair.  *Id.*  With her low back hurting, she was having more difficulty and "cannot use the cane as reliably with her left arm."  *Id.*  He found no convincing evidence of neurologic deficit.  *Id.*  He determined that her work status continued to be sedentary.  *Id.*  He referred Plaintiff to an orthopedic specialist for evaluation of her right shoulder injury.  *Id.*

On June 8, 2004, an x-ray of Plaintiff's left knee revealed moderate to marked tricompartmental degenerative changes.  R. 139.  A chest x-ray on June 30, 2004, revealed mild cardiomegaly,[10] without evidence of failure or pneumonia.  R. 142.

---

[9] Spondylosis is the ankylosis of a vertebral joint or degenerative spinal changes due to osteoarthritis.  Ankylosis is the immobility and consolidation of a joint due to disease, injury, or surgical procedure.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

[10] Cardiomegaly is the  abnormal enlargement of the heart from either hypertrophy or dilatation.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

On August 11, 2004, Plaintiff was seen by Dr. Thompson.  R. 167.  She
continued to work for the telemarketing firm.  *Id*.  Films of the right shoulder revealed AC
joint arthrosis and the MRI revealed degenerative changes in the rotator cuff.  *Id*.  The
diagnosis of the right shoulder was traumatic impingement.  *Id*.  She was to return to
work "without restrictions."  *Id*.

On August 19, 2004, Plaintiff returned to Dr. Alexander.  R. 154.  Dr. Alexander
noted that Dr. Thompson had recommended physical therapy.  *Id*.  Plaintiff complained
to Dr. Alexander of right lower lumbar pain radiating to her right leg and neck pain.  *Id*.
Dr. Alexander reported "considerable pain behavior," but said to Plaintiff's "credit she
has never asked for strong analgesics and she has never asked to be taken out of
work."  *Id*.  He said that he thought that "her personality simply embellishes her
symptoms to some degree."  *Id*.

On September 1, 2004, Plaintiff was treated by Carlos E. Campo, M.D., for sleep
apnea.  R. 144-145.  Plaintiff said that wearing her CPAP at night had made a "big, big
difference" in her sleep and her level of energy had improved.  *Id*.  She had "been able
to start an exercise program" and had lost "75 pounds since last year."  *Id*.  Dr. Campo
found her obstructive sleep apnea to be "well controlled."  *Id*.  Her asthma was also well
controlled with current inhalers.  *Id*.  He encouraged Plaintiff to continue to lose weight.
R. 145.

On October 14, 2004, Plaintiff was seen again by Dr. Alexander.  R. 151.  Her
attendance at physical therapy had been "inconsistent" and she had made no progress.
*Id*.  She wanted more physical therapy, however.  *Id*.  She was very emotional and told
Dr. Alexander that she had "severe unrelenting pain."  *Id*.  On examination, Dr.

Alexander found that Plaintiff had limited range of motion of her neck and back, but there was no neurologic deficit.  *Id*.  Dr. Alexander found "no objective findings of injury" and said that "the physical examination has shown evidence of symptom magnification and pain behavior."  *Id*.  He found no permanent impairment of Plaintiff's cervical and lumbar spine and released her to her sedentary work.  *Id*.

On October 20, 2004, Plaintiff saw Dr. Thompson for her shoulder injury.  R. 166. While she reported "excellent relief of her pain from the injection," the pain had returned.  *Id*.  Though Plaintiff had full range of motion of her shoulder, she had a "severe Hawkins"[11] sign, severe O'Brien's sign,[12] and negative instability.  *Id*.  She was given another injection and told she could return to work with no overhead lifting and no lifting at eye level greater than 1 pound.  *Id*.

On May 2, 2005, Dr. Thompson again saw Plaintiff for her shoulder pain.  R. 164. He found a "painful shoulder with elements of impingement."  *Id*.  He discussed the option of surgery.  *Id*.

On May 23, 2005, Janelle R. Baker, ARNP, completed a housing form.  R. 247-248.  She checked a box stating that Plaintiff had a "physical, mental, or emotional impairment that is expected to be of long-continued and indefinite duration, substantially

---

[11] Hawkins sign  in fractures of the talar neck, a radiolucent zone beneath the subchondral plate of the head of the talus, indicative of disuse osteoporosis; its absence reflects increased risk of talar avascular necrosis.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

[12] O'Brien's sign is a movement test for shoulder injury and shoulder pain. MEDSCAPE TODAY, found at: http://www.medscape.com/viewarticle/424981_3

impedes his or her ability to live independently, and is of a nature that such ability could be improved by more suitable housing conditions."  R. 247.

On June 4, 2005, Plaintiff was examined on a consultative basis by Frank Medicino, M.D.  R. 181-184.  Plaintiff said that she was still working part-time in telemarketing (21 hours a week).  R. 182.  She did not think she could continue this work because she frequently had to get up to go to the bathroom and experienced pain from sitting for a prolonged period.  *Id*.  Plaintiff said that she did not drive and used "Dial a Ride."  *Id*.  She could bathe herself, with difficulty, cooked microwave food for herself, and her neighbor did the laundry for her.  *Id*.  It was noted that Plaintiff was "extremely obese," weighing 312 pounds.  *Id*.  She was in some distress and pain.  *Id*. Plaintiff "took a long time to get up from the chair in the waiting room and make it to the exam room" and used a cane.  R. 183.  She had difficulty getting on and off the table but was relatively comfortable on the table.  *Id*.  She was unable to bend, take her shoes off, toe-heel walk, or lift her shoulder on the right.  *Id*.  All of the range of motion activities were difficult to perform due to her obesity and osteoarthritis in most of her joints.  *Id*.  Dr. Medicino thought that palpation of the paraspinal muscles, hips, knees, and legs "produced exaggerated pain reaction, even with light touch."  *Id*.  Plaintiff had poor effort on motor strength tests and, said Dr. Medicino, the "weakness was apparently due to the pain of the osteoarthritis."  R. 182-183.  She had been diagnosed with diabetes in 1996, and had developed diabetic neuropathy, lower extremity numbness, tingling, and pain.  R. 181.  She said she could not stand for more than a few minutes at a time.  *Id*.  Dr. Medicino's impression was generalized degenerative joint disease, diabetes, neuropathy, asthma, hypertension, congestive heart failure,

coronary artery disease, and sleep apnea.  R. 184.  Dr. Medicino said: "Some of the

examination revealed exaggerated pain, but overall because of the obesity she had

difficulty moving.  She looked to be in quite a bit of discomfort."  *Id.*  He concluded:

> The number of hours this claimant can be expected to stand and walk in
> an eight-hour workday is two hours.  She can sit for six hours.  An
> assistive device is medically necessary for long distances and uneven
> terrain.
>
> She can lift and/or carry occasionally 20 pounds and frequently 10
> pounds.  There are frequent limitations of posture regarding bending,
> stooping, crouching, climbing and kneeling.
>
> There are no obvious manipulative or environmental limitations.

R. 184.

Dr. Thompson performed surgery on Plaintiff's right shoulder on July 12, 2005.

R. 302.  On December 5, 2005, he examined her and determined that she was at MMI

with a partial permanent impairment of 5% of the whole person, considering only her

shoulder impairment.  R. 294.  He thought that she may require "a formal open rotator

cuff repair in the future," and released her to work without restrictions.  *Id.*  He saw her

again on February 20, 2006.  R. 293.  His diagnosis was a painful shoulder, but he did

not change her MMI.  *Id.*  He gave her an injection of pain medication.  *Id.*  She was to

return to work with a permanent restriction of no overhead lifting.  *Id.*

On September 2, 2005, Plaintiff was examined for the first time by orthopedic

physician Richard W. Murphy, M.D., for problems with her spine.  R. 220.  She weighed

298 pounds and was in "moderate distress."  *Id.*  Dr. Murphy noted the prior cervical

MRI scan "showed no significant right-sided abnormalities" and the lumbar MRI scan

"showed some effusion in the facet joints, but again, no significant evidence of neural

compression, and it was a limited exam." *Id*.  On examination Dr. Murphy found that

Plaintiff had limited flexion and extension of the lumbar and cervical spine.  *Id*.  Dr.

Murphy found that x-rays of the cervical spine showed "C5-C6 degenerative disc

disease" and "to a lesser extent, C6-C7," and, at the lumbar spine, a "significant

abnormality at L4-5 with profound grade II L4-5 spondylolisthesis with a rotational

component at that level as well and a significant apex left lumbar curve noted."  *Id*.  Dr.

Murphy had concerns for a possible cervical disc herniation with right upper extremity

radiculopathy and L5-L5 spondylolisthesis "most likely post-traumatic in nature."  R.

221.  He said:

> At this point, my thought is she most likely had a traumatic injury at L4-L5
> with significant facet disruption and has gone on to develop a post-
> traumatic spondylolisthesis with neural compression as well as a rotational
> component as well as opening of her facet on the right side.

R. 221.  A CT myelogram was ordered of the cervical and lumbar spine.  *Id*.

Plaintiff was seen again by Dr. Murphy on September 27, 2005.  R. 219.  He

referred to the previous MRI scan again as a "limited" examination.  *Id*.  He said:

> I got plain films on her on 09-02-05 that showed grade I, borderline grade
> II, L4-L5 spondylolisthesis with a rotational component at that level as
> well.  *Interestingly, once again, the MRI scan briefly done, did not reflect
> this type of problem*.  She continues to complain of pain in her neck and
> her low back area.

*Id*. (emphasis added).  On examination, Dr. Murphy found that Plaintiff showed

"significant distress," and had limited flexion and extension.  *Id*.  His diagnosis was

degenerative cervical disc disease, concerns for cervical disc herniation, and "L4-L5

spondylolisthesis, significant issues."  *Id*.  Dr. Murphy concluded:

> Once again, at this point, I have got significant concerns.  She has a
> significant abnormality of her lumbar spine.  At this point, I once again,

reiterated that I would recommend a CT myelogram of the cervical and lumbar spine.  Once again, I think she most likely had a traumatic injury at L4-L5 with significant facet disruption that has gone on to develop a poasttraumatic spondylolisthesis with significant neural compression, rotational deformity as well.  I am going to, once again, recommend a CT myelogram.

*Id.*

The CT myelogram was conducted on November 11, 2005, in two stages.  R. 211-218.  The "postmyelogram" of Plaintiff's cervical spine revealed minimal posterior disc bulging and osteophyte complex was found at C5-C6, with no evidence of cord deformity.  R. 211.  This was found to be "mild degenerative disk disease at C5-6 without evidence of neural compromise."  R. 212.

The first myelogram of the lumbar spine was "poorly visualized" due to the patient's "morbid obesity."  R. 214.  The diagnostic impression was "anterolisthesis of L4 on L5," and a "mild left lateral subluxation of L4 on L5."  *Id.*  There was also an "apparent mild spinal canal stenosis at L4-5 resulting in probable impingement of the L5 nerve roots bilaterally."  *Id.*  A "postmyelogram" of the lumbar spine was then conducted.  R. 216.  The physician reading the imaging wrote:  "The mild anterolisthesis of L4 on L5 noted on flexion and extension views from the plain film myelogram is no longer apparent.  This suggests the presence of instability at this level."  R. 216.  It was further found:

L4-5:  There is severe bilateral facet osteoarthritis with relative diastasis of the facet joints.  The previously demonstrated anterolisthesis of L4 on L5 is essentially resolved when compared with the plain film myelogram performed earlier today.  This suggests the presence of instability at this level, likely related to the severe bilateral facet osteoarthritis.  There is mild spinal canal stenosis related to a combination of very minimal residual anterolisthesis (approximately 2 mm) and bilateral facet joint hypertrophy.  This results in moderate narrowing of the right lateral recess

and mild narrowing of the left lateral recess, but there is no definite nerve root impingement. *This certainly may be accentuated with increasing degrees of spondylolisthesis related to changes in positioning, and could certainly result in impingement of at least the right L5 nerve root, and possibly the left L5 nerve root as well.* Clinical correlation is recommended. The neural foramina remain patent bilaterally.

R. 217 (emphasis added).

November 28, 2005, was Plaintiff's last day of work as a telemarketer, and she alleges onset of disability on this date. R. 379-380. On November 29, 2005, Dr. Murphy reviewed the CT myelogram results. R. 210. He determined that the "CT myelogram shows an unstable L4-L5 spondylolisthesis with significant mobility on flexion/extension. No other evidence of neural compression noted. CT myelogram of her cervical spine shows no significant neural compression noted." *Id.* Dr. Murphy thought that surgery was indicated, and he discussed this with Plaintiff. *Id.* He had concerns, however, about the amount of improvement she might get and doubted whether she needed surgical intervention "in reference to her lumbar spine with the amount of instability that she has and motion on flexion/extension." *Id.* Dr. Murphy also noted her other significant medical problems, diabetes, high blood pressure, and heart problems. *Id.*

On December 27, 2005, Dr. Murphy again saw Plaintiff. R. 209. He said that she had "grossly unstable L4-L5 spondylolisthesis," and discussed the possibility of surgery. *Id.* Plaintiff said that she knew that she had to have something done because "she is miserable." *Id.* She was wearing a lower spine brace. *Id.* Plaintiff wanted to proceed with surgery, and had an appointment with Dr. Falconer on January 5, 2006. *Id.* Surgery was planned for January 25, 2006. *Id.*

On January 30, 2006, Dr. Murphy again saw Plaintiff.  R. 208.  Dr. Falconer had

determined that he was "not sure that she would make it through surgery and that [she]

was on a ventilator for three days after her shoulder arthroscopy and that a prolonged

prone procedure would be even worse, and the patient may require a trach

[tracheotomy]."  *Id.*  Dr. Murphy said: "Given this, I made the decision not to do any

surgery on her."  *Id.*  Plaintiff continued to complain of back pain going into both legs.

*Id.*  On examination, straight leg raising was negative and Plaintiff had no pain on

rotation of either hip.  *Id.*  Dr. Murphy prescribed bilateral L4 and L5 nerve root blocks

and started her on Neurontin[13] and continued her pain medications.  *Id.*  On February 1,

2006, Dr. Murphy sent a report to the workers' compensation insurer stating that Plaintiff

needed bilateral nerve root blocks and could not work at that time.  R. 298.

On March 21, 2006, Dr. Murphy said that the nerve root blocks had "helped her a

fair amount."  R. 206.  He again noted that she had "L4-L5 spondylolisthesis with

instability in a patient that a non-operative candidate from medical issues."  *Id.*  He

added Soma[14] to her medications.  *Id.*

The next day, March 22, 2006, Plaintiff injured her pelvis in a fall.  R. 308.  She

had a pain medication injection on May 2, 2006.  R. 205.  On May 23, 2006, she

---

[13] Neurontin has two uses.  First, it may be prescribed with other medications to treat partial seizures (the type in which symptoms are limited).  It can be used whether or not the seizures eventually become general and result in loss of consciousness.  Second, it can be used to relieve the burning nerve pain that sometimes persists for months or even years after an attack of shingles (herpes zoster).  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[14] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

reported significant trouble getting comfortable, and her back and legs were bothering her "a significant amount."  R. 204.  She was still using a brace.  *Id.*  Dr. Murphy decided to try a third set of injections, refilled her medications with some Vicoprofen,[15] continued Neurontin and Quinine, and was to try to get her a hospital bed "to get her more comfortable at night."  *Id.*

On August 11, 2006, Dr. Murphy again noted that Plaintiff had unstable spondylolisthesis, that he had done three sets of injections, and she continued "to have significant symptomatology" and was in a brace.  R. 202.  He said she was a "non-operative candidate," and he was "not sure if there is anything else I can do to improve her symptomatology."  *Id.*  He made a "pain management" referral because he thought she had reached maximum medical improvement and needed "chronic pain management."  *Id.*

On September 22, 2006, Plaintiff was seen by Joshua Fuhrmeister, M.D., on a workers' compensation consultation for pain management.  R. 279.  Dr. Fuhrmeister related Plaintiff's medical history.  In particular he noted:

> Surgery was offered initially but then declined secondary to the patient's overall poor health.  The patient had several epidural injections which helped but only temporarily.  The patient describes constant throbbing and sharp pain in her low back.  With the radiating right leg pain she also has numbness/paresthesias and weakness.  Her pain is made worse with mostly any physical activity.  Because of the spondylolisthesis she wears a back brace which limits her mobility significantly.  Sleeping is very

---

[15] Vicoprofen is a chemical cousin of the well-known painkiller Vicodin. Both products contain the prescription pain medication hydrocodone. However, while Vicodin also includes acetaminophen (the active ingredient in Tylenol), Vicoprofen replaces it with ibuprofen (the active ingredient in Advil).  Vicoprofen relieves acute pain. It is generally prescribed for less than 10 days, and cannot be used in the long-term treatment of osteoarthritis or rheumatoid arthritis.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

difficult for her and she wakes up frequently in pain.  Her ususal pain level
is 7-10/10.

R. 279.  On examination Dr. Fuhrmeister found that Plaintiff was "unable to get on the

examination table secondary to obesity."  R. 282.  Dr. Fuhrmeister determined that there

was little to offer Plaintiff, and that additional injection therapies would only give

temporary relief.  R. 283.  He said that her weight was the largest factor in her pain, and

that "[i]f she could lose weight her pain would improve and she would be a better

surgical candidate."  *Id.*

Meanwhile, on March 1, 2006, Plaintiff had gone to Neighborhood Health

Services and was seen by Nina Sumlar, M.D., with complaints of chest pain, asthma,

depression with anxiety and panic attacks, and leg cramps.  R. 235.  Dr. Sumlar found

Plaintiff's diabetes to be uncontrolled, with neuropathy, and that Plaintiff was not

compliant with her diabetic diet and craved sweets.  *Id.*  Zoloft[16] was among the

medications prescribed.  *Id.*  On July 6, 2006, Dr. Sumlar again saw Plaintiff.  R. 232.

Plaintiff had started her special diet, and denied "dietary indiscrtions (sweets,

starches)."  *Id.*  She continued to have anxiety attacks despite taking Zoloft, and the

dosage of Zoloft was increased and  Klonopin[17] was prescribed.  *Id.*  On August 21,

2006, it was noted that Plaintiff had missed an appointment with Dr. Sumlar because

---

[16] Zoloft is prescribed for major depression – a persistently low mood that interferes
with everyday living.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[17] Klonopin is used alone or along with other medications to treat convulsive
disorders such as epilepsy. It is also prescribed for panic disorder, that is, unexpected
attacks of overwhelming panic accompanied by fear of recurrence. Klonopin belongs to
a class of drugs known as benzodiazepines.  PDRhealth™, PHYSICIANS DESKTOP
REFERENCE.

she was having trouble breathing and could not get out of bed.  R. 230.  Plaintiff saw Dr.

Sumlar again on September 25, 2006.  R. 228.  She weighed 321 pounds.  *Id.*  Dr.

Sumlar found that her hypertension and diabetes were uncontrolled.  *Id.*

On January 8, 2007, a deposition was taken of Dr. Murphy.  R. 361-368.  Dr.

Murphy testified that he is board certified in orthopedic surgery.  R. 362.  Dr. Murphy

said that when he saw Plaintiff on September 27, 2005, the "plain films that I had did not

correlate with the MRI scan report that I had."  R. 363.  Dr. Murphy was asked to give

an opinion as to why that was so, and he explained:

> [T]here is a significant difference between standing and supine.  So if she
> was lying on the MRI scan table on her back, her spondylolisthesis could
> have reduced and it looked good, but when she stands up, it slides
> forward, which is consistent with instability.

R. 363.  Dr. Murphy further explained that after he got a CT myelogram, he saw that

Plaintiff had "an unstable L4-L5 spondylolisthesis with motion on flexion and extension

films."  *Id.*  This confirmed Dr. Murphy's previous suspicions about the instability.  *Id.*

Dr. Murphy said that unstable spondylolisthesis does not respond to conservative

treatment, and surgery is needed.  R. 363.  He knew that Plaintiff had had to be on a

ventilator for several days after her shoulder surgery, and said that back surgery would

be "a more significant surgery."  *Id.*  He had prescribed the back brace to decrease

Plaintiff's motion on flexion and extension until an operation could be performed.  R.

364.  He continued to keep Plaintiff off work.  *Id.*  After Plaintiff saw Dr. Falconer, Dr.

Murphy concluded that Plaintiff was not "a reasonable operative candidate."  *Id.*

Dr. Murphy said that although he gave Plaintiff an 11% disability rating for her back problems, "she's going to be unable to work."  R. 365.  Dr. Murphy said that before Plaintiff could undergo surgery, she would:

> have to lose a significant amount of weight, her COPD would have to improve significantly, and she would have to get a much better control of her diabetes.  And really, she's kind of in a snowball, because she can't exercise to get the weight off.  She can't be active because of the instability of her lumbar spine, so she's just in my opinion in a pretty tough situation.

R. 365.  Dr. Murphy said that the only treatment left for Plaintiff is pain medication, much the same as treating a patient with terminal nonoperative metastatic cancer.  R. 366. He said that sleeping in a flexed position was common and "tends to hep a significant amount," and he thought that Plaintiff would need a hospital bed for the rest of her life.

*Id.*

Dr. Murphy said that he thought that Plaintiff would "probably be unable to obtain any form of employment."  R. 366.  He explained:

> You know, with the instability that she has going on, even sitting at a desk job with a brace on, moving back and forth, would potentially cause more irritability.  I mean, that's even desk work that I don't think she could do, sitting, desk work.  And definitely, anything as far as moving, doing any form of standing for a prolonged period would be unreasonable.  And the amount of pain medication that she would potentially be requiring also could potentially affect her judgment.  So I would be uncomfortable releasing her to do basically any form of work, especially given her significant instability at L4-L5.

R. 366.  He continued:

> Well, she had been on Vicoprofen prior to then, which is a narcotic.  Also, on 6/27, I had started her on some methadone as well.  So any of those medications, I wold be pretty uncomfortable with her doing any judgment issues as far as work, as well as, like I said, she has the instability at L4-L5, so even sitting in a chair would cause trouble with her lumbar spine.

R. 367.  He explained that methadone is now used by physicians for long term pain

management because it tends to last longer than Vicodin or Percocet.  *Id*.  Dr. Murphy

said that his opinion as to Plaintiff's inability to do any kind of work was based solely

upon her L4-L5 unstable spondylolisthesis "for fear of injuring herself further."  *Id*.

**Legal Analysis**

> **Whether the ALJ erred in failing to give great weight to the opinion of Dr. Murphy**

Plaintiff contends that the ALJ erred by failing to give adequate reasons

supported by substantial evidence for not giving great weight to the opinion of Dr.

Murphy, her treating physician.  Doc. 17, p. 14.

The opinion of a claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary.  Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a

"detailed, longitudinal picture" of impairments is the length of the treatment relationship,

the frequency of examination, the extent of the knowledge of the treating source as

shown by the extent of examinations and testing, the evidence and explanation

presented by the treating source to support his or her opinion, the consistency of the

opinion with the record as a whole, and whether the treating source is a specialist with

respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and clearly articulated.  Phillips v. Barnhart, 357 F.3d at 1241.

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . .  Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  See also, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The Administrative Law Judge in this case wrote:

> The undersigned does not accept Dr. Murphy's opinion rendered in his deposition.  Dr. Murphy's testimony has internal inconsistencies which render his opinion less credible.  Dr. Murphy testified on page 5 and 6 of the transcribed deposition that on September 2, 2005, he restricted the claimant to lifting 10 pounds, no prolonged standing or walking, no climbing, bending or stooping, may sit eight hours a day and two hours at a time (Exhibit 19F, p. 3).  Then Dr. Murphy removed the claimant from work status on November 29, 2005[,] because of unstable spondylolisthesis (Exhibit 19F, p. 3).  Dr. Murphy testified to these restrictions based on a work status report he completed on November 29, 2005[,] and September 1, 2006 (Exhibit 15F, pp. 77-78), but there were no

progress notes, office notes or objective findings in physical examinations to support this form.  These notes reveal no gross motor or sensory changes; negative straight leg raise; motor intact in the lower extremities; no reflex changes, nor focal deficit (Exhibit 14F, p. 20).  The post myelogram lumbar spine CT read as nearly resolved spondylolisthesis of L4 on L5 (Exhibit 14F, p. 17).

Dr. Murphy treated the claimant with three nerve blocks, Neurontin and pain medication.  Most of the time the claimant had limited flexion/extension with lateral bending of the lumbar spine with some tenderness.  But on the other hand, the claimant's motor testing had been intact in the lower extremities.  She had negative straight leg raise, negative femoral stretch, no motor of sensors changes noted, no reflex changes noted and no motor changes.  These restrictions do not support his opinion that she cannot do any type of work activity.  Dr. Murphy's opinion is contradicted by all of the other medical opinions in the record including her treating physician, Dr. Alexander.  Dr. Murphy's opinion is also contrary and not consistent with the claimant's activities of daily living. The claimant testified she fixes breakfast, does the dishes, she sits a couple of hours at a time during the day, she goes grocery shopping, goes to church on Sunday from 1:00 P.M. to 3:00 P.M., takes the bus, and independently takes care of her own needs.

R. 25-26.

The central issue in this case is whether Plaintiff has such unstable spondylolisthesis at L4 and L5 that this impairment, coupled with her obesity and related health problems, causes such severe pain on movement or prolonged sitting that she cannot perform a sedentary job 8 hours a day, 40 hours a week.  Dr. Murphy gave a detailed explanation of his earlier medical opinion in his deposition.  That explanation and opinion are not inconsistent with his medical notes.  On September 2, 2005, when Dr. Murphy first began treatment of Plaintiff for her spinal problems, Dr. Murphy found that Plaintiff had limited flexion and extension of the lumbar and cervical spine.  R. 220. He said that the x-rays of the lumbar spine showed a "significant abnormality at L4-5 with profound grade II L4-5 spondylolisthesis with a rotational component at that level

as well and a significant apex left lumbar curve noted."  *Id.*  He expressed concerns for

a possible cervical disc herniation with right upper extremity radiculopathy and L5-L5

spondylolisthesis "most likely post-traumatic in nature."  R. 221.  He said:

> At this point, my thought is she most likely had a traumatic injury at L4-L5 with significant facet disruption and has gone on to develop a post-traumatic spondylolisthesis with neural compression as well as a rotational component as well as opening of her facet on the right side.

R. 221.  A CT myelogram was ordered of the cervical and lumbar spine.  *Id.*

Plaintiff was seen again by Dr. Murphy on September 27, 2005, but she had not

yet had the CT myelogram.  R. 219.  Dr. Murphy again referred to the previous MRI

scan, the one that Dr. Alexander had, as a "limited" examination.  *Id.*  He said:

> I got plain films on her on 09-02-05 that showed grade I, borderline grade II, L4-L5 spondylolisthesis with a rotational component at that level as well.  *Interestingly, once again, the MRI scan briefly done, did not reflect this type of problem.*  She continues to complaint of pain in her neck and her low back area.

*Id.* (emphasis added).  On examination, Dr. Murphy found that Plaintiff showed

"significant distress," and had limited flexion and extension.  *Id.*  Dr. Murphy concluded:

> Once again, at this point, I have got significant concerns.  She has a significant abnormality of her lumbar spine. . . .  Once again, I think she most likely had a traumatic injury at L4-L5 with significant facet disruption that has gone on to develop a poasttraumatic spondylolisthesis with significant neural compression, rotational deformity as well.

*Id.*

The CT myelogram confirmed Dr. Murphy's apprehensions.  It was found in that

study that Plaintiff had "severe bilateral facet osteoarthritis with relative diastasis of the

facet joints" at L4 and L5."  R. 217.  "Instability" was suggested at this level.  *Id.*  It was

also found:  "This certainly may be accentuated with increasing degrees of

spondylolisthesis related to changes in positioning, and could certainly result in impingement of at least the right L5 nerve root, and possibly the left L5 nerve root as well." *Id.*

On November 29, 2005, Dr. Murphy reviewed the myelogram results.  R. 210. He determined that the "CT myelogram shows an unstable L4-L5 spondylolisthesis with significant mobility on flexion/extension." *Id.*  Dr. Murphy had concerns about the amount of improvement she might get from surgery, and doubted whether she needed surgical intervention given the "amount of instability" in her lumbar spine.  *Id.*  Dr. Murphy also noted her other significant medical problems, diabetes, high blood pressure, and heart problems, problems which another physician later determined were of sufficient concern to make surgery inadvisable.  *Id.*  Thus, Dr. Murphy's opinion as expressed in his deposition was not inconsistent with his clinical opinion recorded in his medical notes.

The ALJ also discounted Dr. Murphy's opinion in part by finding that the CT myelogram had shown a "nearly resolved spondylolisthesis of L4 on L5."  R. 26.  Even without Dr. Murphy's explanation, that is a plainly erroneous reading of the findings in the CT myelogram.  The findings were:

> The mild anterolisthesis of L4 on L5 noted on flexion and extension views from the plain film myelogram is no longer apparent.  *This suggests the presence of instability at this level.*

R. 216 (emphasis added).  Again, the findings from that scan were:

> The previously demonstrated anterolisthesis of L4 on L5 is essentially resolved when compared with the plain film myelogram performed earlier today.  *This suggests the presence of instability at this level, likely related to the severe bilateral facet osteoarthritis.*

R. 217 (emphasis added).  In other words, Plaintiff's spine moved when she changed

positions, and her impairment was not visible in some positions.

Dr. Murphy fully explained this in his deposition.  He said that when he saw

Plaintiff on September 27, 2005, the "plain films that I had did not correlate with the MRI

scan report that I had."  R. 363.  He explained:

> [T]here is a significant difference between standing and supine.  So if she
> was lying on the MRI scan table on her back, her spondylolisthesis could
> have reduced and it looked good, but when she stands up, it slides
> forward, which is consistent with instability.

R. 363.  Dr. Murphy further explained that after he got a CT myelogram, he saw that

Plaintiff had "an unstable L4-L5 spondylolisthesis with motion on flexion and extension

films."  *Id.*  This confirmed Dr. Murphy's previous suspicions about the instability.  *Id.*

Dr. Murphy also completely explained why he had concluded that Plaintiff would

"probably be unable to obtain any form of employment."  R. 366.  He explained that

"even sitting at a desk job with a brace on, moving back and forth, would potentially

cause more irritability."  R. 366.  He said:  "And definitely, anything as far as moving,

doing any form of standing for a prolonged period would be unreasonable."  *Id.*  He said

that the amount of pain medication Plaintiff would require (she was taking methadone)

"could potentially affect her judgment."  *Id.*  He said that "she has the instability at L4-L5,

so even sitting in a chair would cause trouble with her lumbar spine."  R. 367.

It is true that Dr. Murphy's medical notes made some findings that superficially

seem inconsistent with his ultimate opinion.  On five occasions he  found that Plaintiff's

motor abilities were intact and the straight leg raising test was negative.  *E.g.,* R. 202,

204, 208, 209, 220.  Also, at the first examination, he found no sensory changes.  R.

220.  He also consistently found, however, that Plaintiff was limited in flexion, extension, and lateral bending of the lumbar spine.  R. 210, 209, 206, 204, 219, 220.  On once occasion he found equivocal straight leg raising.  R. 220.  In another case, these findings might be substantial evidence in the record to discount a treating physician's opinion, especially if the opinion was, as in some cases, a bare conclusion about a spinal condition without explanation.  But here, Dr. Murphy's opinion is not a bare conclusion.  It is supported by his medical notes from the first visit, on September 2, 2005, on the September 27, 2005, examination, and on November 29, 2005, when Dr. Murphy finally had the results of the CT myelogram.  It is also fully supported by findings in the last CT myelogram itself and by Dr. Murphy's explanation in his deposition. Further, it is unknown on this record whether the findings of intact motor ability, intact senses, and negative straight leg raising are medically inconsistent with the finding of such significant instability of the spine at L4 and L5.  In summary, given the thoroughness of Dr. Murphy's discussion of his opinion, these apparent inconsistencies simply are not enough to fail to give Dr. Murphy's opinion substantial weight.

The ALJ also declined to give substantial weight to Dr. Murphy's opinion because he found it to be contrary to the opinions of the other physicians, including Dr. Alexander, who is a treating physician.  On April 21, 2004, May 24, 2004, August 11, 2004, October 14, 2004, and October 20, 2004, Dr. Alexander concluded that Plaintiff was capable of performing sedentary work.  R. 162, 158, 167, 151, 166.  On June 4, 2005, Dr. Medicino, who was not a treating physician, determined on a consultative basis that Plaintiff could do sedentary work.  R. 184.  All of these opinions were rendered during the period when Plaintiff was still working in a sedentary telemarketing

job, and none of these had the benefit of Dr. Murphy's diagnosis and the results from the November, 2005, CT myelogram.  Indeed, on August 19, 2004, Dr. Alexander said that Plaintiff reported "considerable pain behavior," which he thought was exaggerated, but he said to Plaintiff's "credit she has never asked for strong analgesics and she has never asked to be taken out of work."  R. 154.  Under these circumstances, the earlier opinions of Drs. Alexander and Medicino (that Plaintiff could continue to do sedentary work) are incomplete, out of date, did not have the benefit of Dr. Murphy's opinion and the results of the November, 2005, CT myelogram, and are not substantial evidence in the record to not give Dr. Murphy's opinion significant weight.

The ALJ also determined that Dr. Murphy's opinion did warrant substantial weight because contradicted by Plaintiff's daily activities.  He determined that "she fixes breakfast, does the dishes, she sits a couple of hours at a time during the day, she goes grocery shopping, goes to church on Sunday from 1:00 P.M. to 3:00 P.M., takes the bus, and independently takes care of her own needs."  R. 26.  The ALJ exaggerated the extent of Plaintiff's daily activities, and to that extent, his finding is not supported by substantial evidence.  Plaintiff testified that she "can fix a simple breakfast for herself, and sometimes does the dishes," and "relies upon her roommate to do laundry and vacuuming."  R. 402.   At another point, it was reported that she used a microwave to prepare food for herself.  R. 182.  Plaintiff said that the best position for her was lying down.  R. 399.  She said that she spends a lot of time during the day lying down, not sitting.  R. 402.  She said that she thought that she could sit for only about an hour, R. 400, but also said she does sit up a couple of hours during the day.  R. 403.  She said that she cannot use the shower.  R. 404.  These are quite minimal activities.  More

important, evidence of some ability to prepare a meal, go to church, take public

transportation, and the like is not substantial evidence in the record to disregard Dr.

Murphy's opinion. Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to

perform sporadic light activities does not mean that the claimant is able to perform full

time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the

court must consider the entire record when determining whether the evidence of a

claimant's daily activities is substantial evidence for the conclusion that she retains the

residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir.

1997) ("Nor do we believe that participation in everyday activities of short duration, such

as housework or fishing, disqualifies a claimant from disability or is inconsistent with the

limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d

1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be

considered, including the claimant's testimony that she had to lie down after two hours

of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory

citation to a claimant's "daily activities" as a basis for failing to believe her testimony as

to pain was insufficient where there was a medical condition that reasonably could have

given rise to the pain described, and, although she testified that she cooked and

shopped for herself, she had trouble putting on her clothing).

　　　　In summary, the reasons given for refusing to give substantial weight to the

opinion of Dr. Murphy are insufficient and not supported by substantial evidence.

"Where the Secretary has ignored or failed properly to refute a treating physician's

testimony, we hold as a matter of law that he has accepted it as true." MacGregor v.

Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  Dr. Murphy's opinion, as the most recent

treating orthopedic surgeon, should have been given controlling weight.

> **Whether the ALJ gave sufficient reasons supported by substantial evidence to discount Plaintiff's pain testimony**

> The ALJ found:

> > After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

R.  23.

This stock paragraph has appeared recently in a number of cases that I have

reviewed.  It is an odd formulation when measured by the settled law in this circuit for

how an ALJ must evaluate pain testimony.  The Eleventh Circuit's standard is:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) *that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (emphasis added).

If it is true, as the ALJ found, that "the claimant's medically determinable

impairments could reasonably be expected to produce the alleged symptoms," then

subpart (2)(b) has been satisfied.  This leaves for consideration subpart (1), whether

there is "evidence of an underlying medical condition."  Evidence of an underlying

medical condition is also satisfied in this case, Dr. Murphy's diagnosis of unstable L4-L5 spondylolisthesis.  Of course, there were other "underlying medical conditions," but this one is enough.  Plaintiff, therefore, has satisfied both necessary elements and the ALJ should have found her to be fully credible.

The ALJ would have fully credited Plaintiff had he fully credited Dr. Murphy.  Dr. Murphy's diagnosis and opinion completely supports Plaintiff's testimony concerning the degree of pain she suffers, and her testimony regarding her inability to sit for significant periods of time without severe pain.

The ALJ also discredited Plaintiff because he faulted her for having failed to lose significant amounts of weight, as urged by her physicians.  R. 23-24.  He said:

> The undersigned is not convinced the claimant's discomfort is as severe
> as alleged in part due to the evidence that reflects any attempt to put forth
> some effort to alleviate her symptoms.  The claimant bears some
> responsibility in following her doctors' advice and the evidence shows she
> is able to do so, when motivated.

R. 23-24.

The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  The Secretary may deny benefits "when a claimant, without good reason, fails to follow a prescribed course of treatment that could restore her ability to work."  McCall v. Bowen, 846 F.2d 1317, 1319 (11th Cir. 1988); Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988).  "In order to deny benefits on the ground of failure to follow prescribed treatment, the ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored," and this finding itself must be supported by substantial evidence.

<u>Dawkins</u>, 848 F.2d at 1213 (citations omitted).  Moreover, Social Security Ruling 02-1p

provides:

> We will rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits. . . .
>
> When a treating source has prescribed treatment for obesity, the treatment must clearly be expected to improve the impairment to the extent that the person will not be disabled.  As noted in question 13, the goals of treatment of obesity are generally modest, and treatment is often ineffective.  Therefore, we will not find failure to follow prescribed treatment unless there is clear evidence that treatment would be successful.

SSR 02-1p.

The ALJ's determination that Plaintiff could lose weight if she tried seems to have

been compelled by the ALJ's complete rejection of Dr. Murphy's opinions.  Dr. Murphy

said that Plaintiff "is kind of in a snowball, because she can't exercise to get the weight

off.  She can't be active because of the instability of her lumbar spine, so she's just in

my opinion in a pretty tough situation."  R. 365.  He said that her condition was like a

patient with nonoperative cancer, treatable only by pain medication.  R. 366.  Had the

ALJ properly given full weight to Dr. Murphy's analysis of Plaintiff's circumstances, he

could not have made the implicit finding that it is reasonably possible for Plaintiff to lose

weight.  This reasoning, therefore, is not substantial evidence in the record to find

Plaintiff's testimony to be not fully credible.

Consequently, the reasons given by the ALJ for discrediting Plaintiff are not

supported by substantial evidence in the record.  Thus, as a matter of law, her

testimony be accepted as true.  <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1225 (11th Cir.

2002).

**Whether the ALJ erred in failing to find that Plaintiff's impairments met or equaled a Listed impairment**

If the court adopts the recommendations above, it need not address this third issue.

**Conclusion**

In summary, the ALJ's rejection of Dr. Murphy's opinion and Plaintiff's testimony did not follow the law governing the weight to be given the opinion of a treating physician and for assessing the credibility of a claimant, and was not based upon substantial evidence in the record.  The decision of the Commissioner should be reversed and the Commissioner ordered to grant Plaintiff's application for benefits.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner be **ORDERED** to grant Plaintiff's application for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on April 13, 2009.


s/     William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE



**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**